UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

– – – – – – – – – – – – – – – – –X

UNITED STATES OF AMERICA

    - against -                          Docket No.   13-CR-601  (RJD)

DALE HARPER,
                Defendant.

– – – – – – – – – – – – – – – – –X


## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL.


KELLY T. CURRIE
ACTING UNITED STATES ATTORNEY
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Michael H. Warren
Lauren Howard Elbert
Assistant U.S. Attorneys
   (Of Counsel)

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................... 1

THE EVIDENCE AT TRIAL ................................................................................... 3

I.      The Government's Case .................................................................................. 3

      Obtaining A CDL .......................................................................................... 3

      The Undercover Investigation ....................................................................... 4

      Surveillance ................................................................................................. 11

      CDL Learner's Permits and CDLs Mailed to the E.D.N.Y ......................... 11

      Kamara's Confession .................................................................................. 14

II.     The Defendants' Case .................................................................................. 14

ARGUMENT    HARPER'S RULE 29 MOTION IS MERITLESS ................................... 15

      Legal Standard ............................................................................................ 16

I.      The Jury Correctly Concluded That The Security Guard Defendants
      Owed A Duty Of Honest Services To The DMV ....................................... 16

II.     The Government Presented Ample Proof That The Defendants
      Unlawfully Produced Identification Documents .......................................... 20

CONCLUSION ...................................................................................................... 22

# TABLE OF AUTHORITIES

## CASES

Skilling v. United States,
  561 U.S. 358 (2010) .................................................................................... 1,15,16

United States v. Botti,
  711 F.3d 299 (2d Cir. 2013) ............................................................................ 21

United States v. Guadagna,
  183 F.3d 122 (2d Cir. 1999) ............................................................................ 16

United States v. Kroshnev,
  526 Fed. Appx. 142 (3d Circuit 2013) ............................................................. 20

United States v. Mendez,
  528 F.3d 811 (11th Cir. 2008) ......................................................................... 20

United States v. Milovanovic,
  678 F.3d 713 (9th Cir. 2012) ............................................................... 16, 17, 19

United States v. Rashwan,
  328 F.3d 160 (4th Cir. 2003) ........................................................................... 21

United States v. Rybicki,
  354 F.3d 124 (2d Cir. 2002) ...................................................................... 18, 19

United States v. Smith,
  985 F.Supp. 2d 547 (S.D.N.Y. 2014) .............................................................. 18

United States v. Sutton,
  13 F.3d 595 (2d Cir. 1994) .............................................................................. 20

United States v. Vanegas,
  294 Fed. Appx. 537  (11th Cir. 2008) .............................................................. 21

United States v. Vilar,
  729 F.3d 62 (2d Cir. 2013) .............................................................................. 16

## STATUTES

18 U.S.C. § 2 .................................................................................................. 21

18 U.S.C. §§ 1341 ........................................................................................... 17

Title 18, United States Code, Section 1028(a)(1) ........................................... 1, 20

Title 18, United States, Code Section 1349 ..................................................... 1

## RULES

Fed. R. Crim. P. 29(a) ...................................................................................... 16

PRELIMINARY STATEMENT

On July 17, 2015, following a jury trial, the defendant Dale Harper and his co-defendants Joachim Pierre Louis, Tanael Daniel, Luc Desmangles and Beayaeh Kamara were convicted of Conspiracy to Unlawfully Produce Identification Documents, in violation of Title 18, United States Code, Section 1028(a)(1) and Conspiracy to Commit Honest Services Mail Fraud, in violation of Title 18, United States, Code Section 1349.

The defendants' convictions arose from their participation in a scheme to assist unqualified applicants for New York State Commercial Driver's Licenses ("CDLs") in cheating on the written tests for CDLs taken by those applicants. The scheme depended upon the participation of security guards, assigned to various New York State Department of Motor Vehicles (DMV) locations, who in return for cash bribes, would turn a blind eye to, and in some cases assist in, the cheating.

Harper has moved, on behalf of himself and his co-defendants, for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure. In doing so, Harper does not contest his participation in the aforesaid scheme. Instead he contends that the government's proof at trial failed to establish a fiduciary relationship between the security guards and the DMV, as required under <u>Skilling v. United States</u>, 561 U.S. 358 (2010), to support an honest services mail fraud conviction. Harper further argues that because the government failed to prove that he or any of his co-defendants aided and abetted the actual production of CDLs or CDL learner's permits, his conviction for 18 U.S.C. § 1028(a)(1) should be set aside.

As set forth more fully below, Harper's Rule 29 motion is meritless and should be summarily denied.

THE EVIDENCE AT TRIAL

I.      The Government's Case

        Obtaining A CDL

        In New York State drivers of certain commercial vehicles, such as school buses, tractor trailers and trucks transporting hazardous waste, are required to possess a CDL. The New York State DMV issues CDLs in accordance with regulations established by the federal government.  (T: 49 – 50).[1]

        In 2013, to receive a CDL, drivers were required to possess a valid New York or other state-issued driver's license and to pass written tests designed to evaluate the applicant's knowledge of how to safely operate the particular vehicle or vehicles for which the applicant sought a CDL.  (T: 50 - 51).  The written CDL tests were multiple choice format and given only in English or Spanish.  The CDL applicants were not allowed to consult any written or other materials while taking the tests.  Moreover, upon receipt of any tests, applicants were not allowed to leave the testing areas until the tests were completed. . (T: 51 – 53, 59, 70 – 72).

        Upon completion of any written multiple choice CDL test, the applicant would submit it for immediate grading at the DMV office where the test was taken.  If the applicant passed the test he or she would at that time receive a temporary CDL learner's permit. Subsequently, the applicant would receive a photo identification CDL learner's permit by United States mail at an address designated by the applicant.  (Id.)

_____

        [1]Parenthetical references preceded by the designation "T" are to the transcript of Harper's and his co-defendants' trial.  References preceded by "GX" refer to government exhibits introduced at that trial.

In order to obtain a CDL, the applicant would then be required to pass a physical examination and a driving test designed to demonstrate the applicant's ability to safely operate the commercial vehicle or vehicles for which a CDL was sought. Upon passing the medical and driving tests, the applicant would receive a New York State-issued CDL in the mail. (T: 52, 69).

In 2013, the CDL written tests could be taken at DMV offices located at 11 Greenwich Street and at 125th Street in Manhattan. (T: 55 – 56). Security cameras recorded the activities inside the Greenwich Street DMV office. No such cameras were installed inside the 125th Street DMV office. (T: 62 – 63).

As with other DMV offices where the CDL tests were given, security guards were assigned at the Greenwich Street and 125th Street DMV offices. Among their duties, the DMV relied upon security guards to monitor the areas where the CDL tests were given in order to prevent applicants from cheating and thereby receiving CDLs for which they were not qualified. (T: 57 – 59).

These security guards were not directly employed by the DMV but were employed by and received their salaries from a private firm servicing the DMV under a contract with New York State. Two of those security guards assigned to the Greenwich Street DMV office were Latoya Bourne and Beayaeh Kamara. (T: 57, 60 – 61).

The Undercover Investigation

On February 27, 2013, New York City Police Detective John Chery, posing as an individual seeking help in cheating on CDL tests, met Dale Harper for the first time.

During this meeting, which took place near an Auto Zone in the Bronx, Detective Chery wore a concealed recording device.  (T: 74 – 75).

During their meeting, Harper, who identified himself as "Reds," explained that he had people working with him who could assist Chery in cheating on written CDL tests. Specifically, Harper explained that a female security guard assigned to a DMV office near Bowling Green in Manhattan worked with him.  This security guard would receive a text message, on the day Chery would go to this DMV office, describing Chery prior to Chery's entering the building.  (T: 75 – 76; GX 50).

Harper further explained that upon receiving his CDL tests, Chery should pretend to be filling out the answers but instead should not do so.  At some point the female security guard would signal Chery to leave that DMV office's testing area with his uncompleted tests.  Outside another person working with Harper would take the tests to a woman who would complete the tests for Chery.  The tests would then be returned to Chery who would then return to the DMV office where the tests would be graded as having been "passed" by Chery.  (Id.)

Harper stated that his services would cost $2,400.  He further explained that he could not charge less because multiple people were involved in the process.   Harper instructed Chery that once he was able to raise the money Chery should call Harper at a cell phone number Harper gave to the detective at that time.  Harper would then arrange with his accomplices for Chery to meet Harper near the Bowling Green DMV office.  (T: 75 – 76, 80; GX 50).

On April 9, 2013, Detective Chery met with Harper at the corner of Battery Park and State Street, in lower Manhattan for the purpose of cheating on CDL tests. (T: 80). Again, the detective wore a concealed recording device. (T: 84; GX 51).

Harper and the detective upon meeting walked to a nearby sandwich shop where Harper explained they would meet the "cousin" of the woman who would complete the CDL tests for Chery. At the sandwich shop Chery was introduced to Harper's trial co-defendant, Joachim Pierre Louis, who identified himself as "Jameson." (T: 81; GX 51). Pierre Louis took the detective's undercover identity driver's license and took information from it to fill out a CDL application form on Chery's behalf. Pierre Louis then instructed Chery that upon receiving a ticket number inside the Greenwich Street DMV office, Chery should step outside and show it to Pierre Louis who would text that number to one of two security guards, one male and one female, inside who were working with him and Harper. Thereafter, Chery would return to the DMV office and, after Chery received the requested tests, one of the security guards would signal Chery to leave the building with the tests. (T: 81 – 82: GX 51).

Upon receiving the aforesaid instructions, Chery, along with Harper and Pierre Louis, walked to the Greenwich Street DMV. Chery went inside and upon receiving his ticket number, left the building where he was met by Pierre Louis. Pierre Louis looked at the ticket and instructed Chery to return inside. Chery complied and, thereafter, received four CDL tests Pierre Louis suggested that Chery request. Approximately five minutes later the

female security guard, Latoya Bourne, instructed Chery to leave the room.[2]  Chery concealed the four tests inside his jacket and went outside.  (T:  83, 89).

Outside, Chery was met by Pierre Louis who took the CDL tests from Chery and departed the area. Pierre Louis was followed to a nearby Burger King by New York State Investigator Anne Peters, who was conducting surveillance in the vicinity of the Greenwich Street DMV and had earlier seen Harper, Pierre Louis and Chery as they first approached that office on the morning of April 9, 2013. (T: 83, 124 – 126).

Inside the Burger King, Investigator Peters saw Pierre Louis, Marie Daniel and the trial defendant Tanael Daniel seated at a table.  Marie Daniel appeared to be writing on papers as Pierre Louis and Tanael Daniel sat nearby.[3]  (T: 127).  Shortly thereafter, Pierre Louis left the Burger King.  Investigator Peters followed him as he returned to the vicinity of the Greenwich Street DMV and met Chery, who was awaiting Pierre Louis's return.  (T:  83, 128).

Pierre Louis returned the four now completed CDL tests to Chery who, following the previous instructions of Harper and Pierre Louis, reentered the Greenwich Street DMV office and submitted the tests for grading.  Upon doing so Chery learned that only three of the four exams had been passed.  (T:  83).  Outside the Greenwich Street DMV office, Chery met Harper and gave him the agreed-upon fee but complained that he had

---

[2]Latoya Bourne was indicted along with Harper.  On January 21, 2015, she pleaded guilty to conspiracy to unlawfully produce identification documents and honest services mail fraud conspiracy.  She is awaiting sentence.

[3]Marie Daniel was indicted along with Harper.  On January 12, 2015, she pleaded guilty to honest services mail fraud conspiracy.  She has not yet been sentenced.

failed one of the tests. Harper then summoned Pierre Louis who assured Chery that he could return and "retake" the unsuccessfully completed test. (Id.).

A New York State photo identification CDL learner's permit was issued in Chery's undercover identity as a consequence of the aforesaid cheating. (T: 96; GX 9).

On May 22, 2013, at approximately 8:00 a.m., Detective Chery returned to lower Manhattan to meet Joachim Pierre Louis. Chery was accompanied by "Shawn Jefferson," another New York City Police Detective posing as a driver seeking assistance in cheating on CDL tests. (T: 90, 164 – 165).[4] Jefferson was wearing a concealed recording device during this meeting. (T: 166).

Inside a sandwich shop in the vicinity of the Greenwich Street DMV, Pierre Louis again explained the procedure for cheating, previously described to Chery. (T:91, 166, 169; GX 52). Thereafter, Jefferson entered the Greenwich Street DMV office and obtained four CDL tests. Shortly thereafter, a pregnant female security guard signaled him with her eyes to leave the testing area. Jefferson complied, exited the building and outside gave his four tests to Pierre Louis, who departed the area. (T: 170 – 171). Chery and the trial co-defendant Luc Desmangles were also outside the Greenwich Street DMV office and waited for Pierre Louis's return with Jefferson. As they waited, Desmangles cautioned Jefferson not to rush back into the test room but await a signal from the female security guard before returning to the testing area. (T: 91, 171 – 172; GX 52).

---

[4]Shawn Jefferson is not the actual name of Chery's undercover detective partner. However, because Jefferson, unlike Chery, was still performing undercover work at the time of trial, he was allowed to testify under an assumed name.

Pierre Louis returned with Jefferson's now completed four CDL tests. Jefferson reentered the Greenwich Street DMV office. As he approached the testing area, a male security guard warned Jefferson that DMV employees were looking for him and Jefferson should tell them he left his tests on the desk before leaving. (T: 172). Jefferson then reentered the testing area and was confronted by a DMV employee regarding his absence. Jefferson claimed that he had departed to go to the bathroom and had left his tests on a desk in the testing area. (T: 173). After the female security guard supported his claim that he had left his tests on a desk Jefferson was informed that he would be permitted to return at a later date to retake the CDL tests. (T: 173).

Jefferson's next attempt to cheat on the CDL written tests occurred not at the Greenwich Street DMV office but at the 125th Street branch.

On July 10, 2013, Chery and Jefferson met Pierre Louis and Desmangles on the corner of Lexington Avenue and 125th Street. Jefferson was wearing a concealed recording device. (T: 181 – 182). Pierre Louis and Desmangles explained that on this date the procedure for cheating would be different. Jefferson would remain in the testing area and either Pierre Louis or Desmangles would come in and remove the tests for Jefferson. While Jefferson waited inside they would have the tests completed and then return them to him. (T: 93, 182; GX 52).

Chery and Jefferson then entered the 125th Street DMV office. Jefferson obtained his CDL tests and sat as a desk in the testing area. Chery waited near the door leading into the testing area. (T: 93, 185). Chery saw Inocente Rene Gonzalez Martinez, a

male security guard who was standing nearby, make a cellular telephone call.[5]  (T: 93, 95). Within minutes Pierre Louis arrived and entered the testing area where he took four blank CDL written tests from Jefferson.  Approximately fifteen minutes later, Pierre Louis returned the now completed tests to Jefferson who had remained in the testing room the entire time. (T: 186).

Jefferson submitted the four tests for grading and learned he had passed three of the four tests.  (Id.).  Outside, Desmangles assured Jefferson that he could retake the failed tests on another day.  Jefferson then paid Desmangles a previously agreed upon fee of $1,400.  (T: 187).

On July 23, 2013, Chery and Jefferson again met Pierre Louis in lower Manhattan for the purpose of Jefferson's cheating on CDL tests.  Jefferson was wearing a concealed recording device but it malfunctioned on that date.  (T: 95, 196 – 197).

Jefferson understood that, as at 125th Street, his tests would be taken from him inside the Greenwich Street DMV.  But as he entered the Greenwich Street DMV he was approached by Beayaeh Kamara who instructed him that once Jefferson obtained the tests he should not even sit down but exit the building.  (T: 197).  Upon receiving these instructions, Jefferson entered the testing area and, after obtaining several CDL tests, immediately left the building.  Outside he was met by Pierre Louis who took the tests, departed the area and

---

[5]Gonzalez Martinez was also indicted for his participation in the cheating scheme described herein.  On January 21, 2015, he pleaded guilty to conspiracy to unlawfully produce identification documents and honest services mail fraud conspiracy. He is awaiting sentence.

returned shortly thereafter, with the completed tests.  Jefferson returned to the testing area inside and upon submitting the tests for grading learned that he had passed them all.  (Id.)

Surveillance

From April through late September 2013, federal and state investigators conducted repeated surveillance of the vicinity of 11 Greenwich Street, both on the nearby streets and from surveillance posts located inside buildings at 26 Broadway and 2 Washington Street.  (T: 131, 146 – 147, 255).  As set forth below, surveillance documented the apparent receipt of cash bribes by Latoya Bourne and Beayaeh Kamara.

On April 22, 2013, at approximately 11:00 a.m., during surveillance inside a vehicle parked on the street in front of the entrance to the 11 Greenwich Street DMV office, Investigator Peters observed Latoya Bourne exit the DMV office and receive what appeared to be United States currency.  Bourne then placed the apparent money in her pocket.  (T: 131 – 132).

On July 26, 2013, Jasmin Jack, an auditor with the New York State Inspector General's office observed Pierre Louis pass an envelope to Beayaeh Kamara on the street across from the entrance to 11 Greenwich Street.  (T: 213).

On August 30, 2013, from the observation post at 2 Washington Street, State Investigator Donnalynn Gazza saw Tanael Daniel passing money to Latoya Bourne near the entrance to the 11 Greenwich Street DMV office.  (T: 257, 260).

CDL Learner's Permits and CDLs Mailed to the E.D.N.Y

Based on video surveillance and other DMV records, state investigators were able to identify approximately 30 – 40 individuals who, as a consequence of Harper's and his

co-defendants' fraud, received CDL learner's permits or CDLs at addresses in the Eastern District of New York. (T: 240 – 242). One of those individuals was Jose Quiroz.

In 2013, a Brooklyn restaurant owned by Quiroz's family and in which he worked was closing. In need of a new job, Quiroz was contemplating obtaining a job as a truck driver. A patron of the restaurant who Quiroz knew as "Shorty" approached Quiroz one day at the restaurant and informed Quiroz that he could help him obtain a CDL learner's permit by cheating on the written tests. (T: 272 – 274).[6]

Thereafter, on August 8, 2013, Quiroz met Shorty at a Brooklyn subway station for the purpose of going to the lower Manhattan DMV office. When Quiroz arrived at the station Shorty was there, accompanied by two other individuals. The group then took the subway to the DMV office in lower Manhattan. (T: 274, 301 – 302).

As Quiroz waited on line to obtain three CDL tests, he received a cell phone call from Shorty who told him to "look out for the security guard who was going to let me in." (T: 275). After receiving his three tests Quiroz sat down near the rear of the testing room but was instructed by a female security guard to sit closer. Quiroz complied and shortly thereafter the male security guard in the room directed Quiroz to step outside with his tests. (T: 275). Surveillance video taken inside the Greenwich Street DMV office testing area shows that the security guards who interacted with Quiroz were Latoya Bourne and Beayaeh Kamara. (GX 262, 263).

_____

[6]At trial, Quiroz identified a photograph of Jose Payano, who was also indicted with Harper, as "Shorty." (T: 284: GX 309) On May 22, 2014, Payano pleaded guilty to honest services mail fraud conspiracy. On May 14, 2015, he was sentenced to a term of 28 months' imprisonment.

Outside, Quiroz was met by a man he had never seen before and who instructed Quiroz to give him the tests. This man was Tanael Daniel, who along with Quiroz, was surreptitiously photographed by State Investigator William Gleeson during their encounter.  (T: 276, 304; GX 132A and 133A).

Tanael Daniel directed Quiroz to hand him the three tests.  Quiroz complied and Daniel explained "Shorty's going to charge you for this."   Daniel then left the area. (T: 276, 281).  Quiroz waited in front of the 11 Greenwich Street DMV and in approximately 15 – 20 minutes Daniel returned with the now completed tests.  (T:  276)

Quiroz returned to the Greenwich Street DMV testing area and Kamara directed him to submit his tests for grading. (T:  276).  The DMV employee grading the tests informed Quiroz that he had received and completed two copies of the same test.  Quiroz was then given a copy of the test he had earlier requested and was directed by the test reviewer to complete that test before any tests would be graded.  (T: 278).

Quiroz returned to a desk and was directed by Latoya Bourne to again go outside with his test.  There Quiroz was met by Tanael Daniel and a second man he had not seen before that date.  Investigator Gleeson who observed and photographed this encounter recognized Tanael Daniel's companion, from earlier surveillance, as Joachim Pierre Louis. (T: 278 - 279, 395; GX 138A and 139A).

Quiroz explained the confusion to Pierre Louis and Daniel.  Daniel took the test from Quiroz and he and Pierre Louis left the area while Quiroz waited in front of the Greenwich Street DMV.   Daniel and Pierre Louis returned with the completed test.  Quiroz reentered the DMV testing area.  There, Kamara instructed him to return to his desk.  Shortly

thereafter Kamara directed Quiroz to submit his tests for grading. Upon the examiner's review, Quiroz learned that each test had been successfully passed. (T: 270).

Quiroz later received a CDL learner's permit by mail at an address in Nassau County. (T: 284).

Kamara's Confession

On September 25, 2013, Beayaeh Kamara was arrested by federal agents. Special Agent Richard McGrade of the United States Department of Transportation conducted a post-arrest interview of Kamara. (T: 312, 317).

Kamara was read his Miranda warnings and, thereafter, agreed to speak to Special Agent McGrade, without a lawyer present. (T: 316 – 317; GX: 310).

Kamara admitted that for approximately six months he had been allowing driver's license applicants to leave the Greenwich Street DMV office with their tests. He also acknowledged being paid cash bribes from Latoya Bourne of between $50 to $100 dollars in return for facilitating the cheating (T: 318  319).

II.     The Defendants' Case

The defendants did not present a case.

## ARGUMENT

## HARPER'S RULE 29 MOTION IS MERITLESS

Pursuant to Rule 29 of the Federal Rules of Criminal Procedure, Harper has moved, on behalf of himself and his co-defendants, for a judgment of acquittal. First, he contends that because his bribe-receiving co-conspirators, Latoya Bourne and Beayaeh Kamara, were employed by a contractor and not directly by the New York State DMV, they owed no duty of honest services to the DMV. Accordingly, Harper argues his conviction of conspiracy to commit honest services mail fraud is not warranted under the holding of Skilling v. United States, 561 U.S. 358 (2010).

Second, Harper argues that his conviction of conspiracy to produce identification documents without lawful authority must be set aside because the government failed to prove that any "one of the conspirators *produced* the CDLs or CDL permits that were issued to customers of the identification production scheme." Harper's Brief, p. 15 (emphasis in original). Instead, Harper argues, the government merely proved that he and his co-defendants aided and abetted the production of such documents. Finally, although he tendered no objection to the Court's jury instructions at trial, he now asserts that to the extent he could have been found guilty on an aiding and abetting theory, the Court's charge was erroneous because it failed to include an aiding and abetting instruction.

Case authority and the trial record demonstrate that Harper's claims are devoid of merit and should be rejected.

<u>Legal Standard</u>

Rule 29 provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). A defendant seeking to set aside a jury's verdict pursuant to Rule 29 "bears a heavy burden." <u>United States v. Vilar</u>, 729 F.3d 62, 91 (2d Cir. 2013). In evaluating defendant's motion the evidence must be viewed in the light most favorable to the government and the motion should only be granted "if the evidence that the defendant committed the crime is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." <u>United States v. Guadagna,</u> 183 F.3d 122, 130 (2d Cir. 1999). <u>See also</u>, <u>United States v. Eppolito</u>, 543 F.3d 25, 45 (2d Cir. 2008).

I.   The Jury Correctly Concluded That The Security Guard
     <u>Defendants Owed A Duty Of Honest Services To The DMV</u>

Harper contends that because the security guard co-defendants, Bourne and Kamara, were not directly employed by the DMV, the jury could not have found that they owed the DMV a duty of honest services. This contention is neither supported by case authority or common sense.

True, as Harper notes, <u>Skilling</u> concluded that a violation of the duty of honest services necessarily entails some breach of a fiduciary duty by a defendant or co-conspirator. However, neither <u>Skilling</u> nor any other case cited by Harper limits such a relationship to those arising from a direct contractual or other formal employer/employee relationship. Indeed one of those cases, <u>United States v. Milovanovic</u>, 678 F.3d 713 (9th Cir. 2012), flatly contradicts Harper's position.

_Milovanovic_ involves facts remarkably similar to those here. _Milovanovic_ was an independent contractor employed by Spokane International Translation, a private contracting company which provided translation services to the Washington State Department of Licenses (DOL). In his capacity as a contract employee, Milovanovic served as a translator for Bosnian-speaking individuals taking written CDL tests. However, in return for a bribe of $2,500, Milovanovic would do more than translate but would assist applicants in cheating by either orally telling them the correct answer in their native tongue or using hand signals to identify correct answers.

Milovanovic's co-defendant Lamb was a non-government employee under contract with the DOL to perform CDL road tests. Lamb too in return for bribes erroneously passed CDL applicants. Milovanovic and Lamb were charged with honest services mail fraud predicated upon their breach of a fiduciary duty to the DOL. The district court dismissed their indictment, concluding that there could be no deprivation of the right to honest services under 18 U.S.C. §§ 1341 and 1346 because as independent contractors neither defendant "had an agency or employment relationship with the State of Washington DOL." 678 F. 3d at 719.

The Ninth Circuit reversed the district court's ruling and reinstated the indictment. The Court noted that while an honest services violation requires breach of a fiduciary duty, such duty is not limited to employer/employee relationships but also "extends to a trusting relationship in which one party acts for the benefit of another and induces the trusting party to relax the care and vigilance which it would ordinarily exercise." 678 F.3d at 724.

In <u>Milovanovic</u> the Ninth Circuit cited in support of its ruling language in <u>United States v. Rybicki</u>, 354 F.3d 124 (2d Cir. 2002), another case relied upon by Harper but which on examination undercuts his Rule 29 attack on the verdict.

In <u>Rybicki</u> two defendant personal injury lawyers paid bribes to claims insurance adjusters employed by various insurance companies, in return for those adjusters expediting their clients' claims. In affirming the defendants' convictions the Court concluded that a fiduciary relationship generally exists between employers and employees. But the Court also made clear that a fiduciary relationship extends not only to "an officer or employee of a private entity" but also to "*a person in a relationship that gives rise to a duty of loyalty comparable to that owed by employees to employers*." 354 F.3d at 141 (emphasis added). <u>See also</u>, <u>United States v. Smith</u>, 985 F.Supp. 2d 547, 601 (S.D.N.Y. 2014) (district court in rejecting attack on honest services indictment noted that under federal law "a party can owe a fiduciary duty even where the party is not financially compensated for the services that the party provides").

Expanding on the above-language, Circuit Judge Reena Raggi, in her concurring opinion in <u>Rybicki</u> noted:

> Today's case presents us with honest services fraud in the context of an employer-employee relationship. But a future case may require us to consider whether there is any principled reason to distinguish between an employee and an arms-length contractor when they engage in identical fraud schemes with the specific intent to deprive a victim of services whose value depends upon honest performance. 354 F.3d at 154.

As Judge Raggi suggested in <u>Rybicki</u> , and as the Court found in <u>Milovanovic</u>, there is no principled reason to conclude that an employee performing a service for an entity owes that entity a fiduciary duty while a contractor performing the same service does not. There was no reason for the jury to have drawn such a distinction here.

Significantly, in <u>Milovanovic</u> the Court stressed that whether, based on their status as contract employees, the defendants owed a duty of loyalty to DOL was a question for the jury.  678 F. 3d at 724.  Here the Court's charge left the question of whether the security guards owed a duty of loyalty to the DMV to be answered by Harper's jury. (T: 473).

Harper recognizes that whether a fiduciary relationship existed between Bourne and Kamara and the DMV was, in fact, a question for the jury.  He is therefore forced to argue that the government "offered no evidence" that a duty of loyalty was owed by the security guards to the DMV.  In making this argument Harper grudgingly concedes that while the DMV might have relied on the guards to prevent cheating, the evidence "was insufficient to demonstrate that the security services company or its employees accepted the obligation."  Harper's Brief p. 13.

Harper's claim is inconsistent with the law.  A fiduciary obligation is based upon behavior that leads the person or entity owed the duty of loyalty to believe that the fiduciary is acting on his behalf not on whether the fiduciary is in fact acting on his behalf. <u>See</u>, <u>Milovanovic</u>, 678 F. 3d. at 724.  <u>See also</u>, <u>Rybicki</u>, 354 F.2d at 141.  Here, based on Bourne's and Kamara's assumption of the duties of security guards, which included preventing cheating on CDL tests  (T: 58 – 59), the DMV reasonably relied on those guards

to perform their duties in a manner commensurate with the interests of the DMV and not those of Harper or any other defendant.

Put simply, regardless of Bourne's or Kamara's state of mind when they first assumed their duties, the jury was amply warranted in finding that their voluntary assumption of the duties of security guards and their consequent receipt of a salary, regardless of the immediate source, imposed upon them a duty of honest services to the DMV.

The jury's conclusion should remain undisturbed.

II.    The Government Presented Ample Proof That The
       Defendants Unlawfully Produced Identification Documents

Harper's contention that the government provided insufficient proof that the defendants unlawfully produced identification documents within the meaning of Title 18, Section, 1028(a)(1) need not detain the Court long.

Harper's argument that the defendants did not conspire to produce identification documents but merely conspired to aid and abet the production of identification documents is little more than a restatement of an argument made in Marie Daniel's pre-trial dismissal motion.

There, as here, the defendant contended that because she never actually produced an identification document she was not guilty of unlawfully producing one under 18 U.S.C. § 1028(a)(1). But ample case authority supports that when a defendant through fraud causes a government agency to produce an identification document, the defendant is guilty of unlawfully producing an identification document under 18 U.S.C. §1028(a)(1). See, e.g., United States v. Sutton, 13 F.3d 595 (2d Cir. 1994) (DMV employee who knowingly processed fraudulent driver's license applications guilty of violating 18 U.S.C.

§ 1028); See also, United States v. Kroshnev, 526 Fed. Appx. 142 (3d Circuit 2013)(conspiracy to violate 18 U.S.C. § 1028(a)(1) conviction based upon defendant providing false residency documents to applicants for Pennsylvania CDLs); United States v. Mendez, 528 F.3d 811 (11th Cir. 2008) (defendant who submitted false supporting documentation to obtain Florida CDL guilty of violating 18 U.S.C. § 1028(a)(1)); United States v. Rashwan, 328 F.3d 160, 165 (4th Cir. 2003) (defendant who obtained state driver's license based on false representations regarding his residency guilty of violating 18 U.S.C. § 1028(a)(1)).

These cases reflect the long settled principle that a defendant is criminally liable when he or she "causes an intermediary to commit a criminal act, even though the intermediary who performed the act has no criminal intent" and is therefore innocent. United States v. Vanegas, 294 Fed. Appx. 537 at 541 (11th Cir. 2008) (affirming conviction of defendant for violating 18 U.S.C. § 1028(a)(1) based upon his submission of false documentation to obtain a Florida CDL). See also, Rashwan, 328 F.3d at 165; 18 U.S.C. § 2.

Based on the aforesaid authority the Court on November 14, 2014, denied Daniel's motion. And recognizing the wisdom of that decision no defendant objected to the Court's instruction that accurately stated that the jury could find the defendants guilty of unlawfully producing identification documents if they through fraud caused the production of an identification document. (T: 469 – 470).

Given Harper's and his co-defendants' failure to object to the Court's instruction, they would have to surmount the hurdles of plain error analysis to justify setting aside the verdict in their case. See United States v. Botti, 711 F.3d 299 (2d Cir. 2013)

(Court applying plain error analysis rejected appeal predicated upon a not objected to error in district court's honest services jury instruction). But we need not address that issue because, as noted, there was no deficiency in the government's proof or error in the Court's instructions.

CONCLUSION

For the above discussed reasons, Harper's Rule 29 motion should be denied.

Dated:    Brooklyn, New York
September 4, 2015

Respectfully submitted,

KELLY T. CURRIE
Acting United States Attorney
Eastern District of New York

By:    _____/s/_____
Michael H. Warren
Lauren Howard Elbert
Assistant United States Attorney